**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| SAMUEL OMORODION,<br><br>Petitioner,<br><br>v.<br><br>ROBERT GUADIAN,<br>*in his official capacity as Field Office Director of the Immigration and Customs Enforcement, Enforcement and Removal Operations, Washington Field Office*,<br>MARKWAYNE MULLIN,<br>*in his official capacity as Secretary of Homeland Security*, and<br>TODD BLANCHE,<br>*in his official capacity as Attorney General of the United States*,<br><br>Respondents. | Civil Action No. 26-3265-TDC |

**MEMORANDUM OPINION**

Petitioner Samuel Omorodion, who is currently in immigration detention, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 against the Director of the Washington Field Office of United States Immigration and Customs Enforcement ("ICE"), the Secretary of Homeland Security, and the Attorney General ("Respondents"). In the Petition, Omorodion seeks immediate release on the grounds that his detention violates the Immigration and Nationality Act, 8 U.S.C. § 1231(a)(6), and the Due Process Clause of the Fifth Amendment to the United States Constitution. After briefing, the Court held an evidentiary hearing on the Petition on September 15, 2026. For the reasons set forth below, the Petition will be GRANTED.

## BACKGROUND

Omorodion is a native and citizen of Nigeria. He lawfully entered the United States in 2015 on an A-2 visa, which subsequently expired. On December 16, 2019, he was convicted of second-degree rape and a sex offense in the third degree. After Omorodion served his prison sentence, on August 2, 2023, ICE arrested him and placed him in removal proceedings. On April 24, 2024, the Immigration Court issued an order of removal but granted Omorodion deferral of removal to Nigeria under the Convention Against Torture ("CAT") (the "CAT deferral order"). The Board of Immigration Appeals ("BIA") affirmed the Immigration Court's ruling on October 25, 2024. Omorodion remained detained for the pendency of the Immigration Court and BIA proceedings.

Following the BIA's decision, ICE detained Omorodion for another three months while seeking to identify a third country to which he could be removed. On January 23, 2025, ICE released Omorodion on an Order of Supervision ("OSUP") because ICE could not "effect [his] deportation or removal during the period prescribed by law." *Omorodion v. Noem*, No. 26-cv-72, 2026 WL 2323240, at *2 (M.D. La. Aug. 11, 2026) ("*Omorodion I*"). For the next five months, Omorodion lived in Baltimore, Maryland with his family and complied with all OSUP requirements. Then, while appearing at a scheduled ICE check-in appointment on June 9, 2025, Omorodion was again detained by ICE officers who told him that his OSUP was being revoked "because of the new administration." Pet. ¶ 4, ECF No 1. ICE transported Omorodion to Louisiana, where he remained in ICE detention centers for over a year.

While detained in Louisiana, Omorodion filed a Petition for a Writ of Habeas Corpus, in which he challenged his prolonged detention. On August 11, 2026, the United States District Court for the Middle District of Louisiana granted that petition. *See Omorodion I*, 2026 WL

2323240, at *5. The court concluded that Omorodion's detention was unlawful under 8 C.F.R. § 241.13(i) because it was not supported by "changed circumstances," and under 8 U.S.C. § 1231(a)(6) as interpreted by *Zadvydas v. Davis*, 533 U.S. 678 (2001), because his removal was not reasonably foreseeable. *Id.* at *4. The court ordered that ICE "release Omorodion under the same conditions of supervision provided in his January 2025 Order of Supervision" and "not re-detain [him] without due process of law, in compliance with all applicable regulations, and in accordance with this Ruling and Order." *Id.* at *5. ICE released Omorodion on the date of the Order, August 11, 2026, and he again returned home to Baltimore, Maryland. On August 14, in compliance with the requirements of the OSUP, Omorodion attended an in-person check-in session at the ICE Field Office in Baltimore. At the check-in, he notified ICE that he believed that his ankle monitor was not working properly. An ICE officer told him that any issues with the monitor could be addressed at the next check-in session on August 28. A separate check-in was scheduled to occur on August 18, at Omorodion's home, to confirm that Omorodion lived at his identified residence.

## I. Re-Detention

Four days later, on August 18, 2026 at approximately 6:00 a.m., five ICE officers arrived at Omorodion's home, handcuffed him, and took him into custody. The officers told him that he had been "messing with the monitor" and that there was a "change in circumstances." Omorodion Decl. ¶ 14, Reply Ex. B, ECF No. 15-2. The officers then placed Omorodion into a van and immediately began driving him to Newark Liberty International Airport ("Newark Airport") in New Jersey. The officers did not tell Omorodion where they were taking him. At approximately 9:15 a.m., the van arrived at Newark Airport. The ICE officers then gave to Omorodion a document entitled Notice of Revocation of Release ("Notice of Revocation" or "Notice"). The Notice of Revocation stated that Omorodion's release was being revoked pursuant to 8 C.F.R. §

241.4(*l*) because "it is appropriate to enforce the removal order entered against you as ICE has the ability and means to effectuate your removal," and that his case was "under review for removal to an alternate country." Notice at 1, Ans. Ex. 3, ECF No. 14-3. Neither the Notice nor the ICE officers named a specific country to which he might be removed. Although the ICE officers asked Omorodion to sign various forms, he did not sign them because he did not understand them and instead asked to speak to his attorney. According to Omorodion, the ICE officers ignored this request.

Respondents assert that sometime on August 18, the ICE officers conducted an informal interview of Omorodion, but he refused to make any statements to them without having his attorney present. Sometime between 3:30 and 4:00 p.m., ICE placed Omorodion on a flight from Newark Airport to Alexandria, Louisiana. At approximately 8:00 p.m., Omorodion was put in a "housing unit" at the airport in Alexandria and was, for the first time that day, allowed to make phone calls, including to his attorney. Omorodion Decl. ¶ 22. He was kept in the housing unit for five days, until August 23, 2026, at which point he was put on a flight back to Newark Airport. After landing, he was driven to an ICE detention center in Farmville, Virginia, where he remains detained at this time. At this point, Omorodion has spent approximately 32 months in ICE detention, including 24 months after receiving the removal order and the CAT deferral order from the Immigration Court.

In the hours immediately following Omorodion's August 18, 2026 arrest, his family contacted his attorney, who promptly began attempting to locate him. At approximately 9:00 a.m., his attorney contacted ICE's Washington Field Office, which oversees removal operations in Maryland, and requested a legal call with Omorodion. A paralegal on Omorodion's legal team also contacted the Washington Field Office and was informed that Omorodion was not in ICE

custody. Omorodion's attorney called the Washington Field Office multiple times, at 9:40 a.m., 10:12 a.m., and 12:07 p.m., and each time was told that Omorodion was not in ICE custody. At 12:09 p.m., she filed the present Petition in the United States District Court for the District of Maryland because Omorodion had been re-detained, and he was last seen, in Maryland. At that time, Omorodion was actually in New Jersey, sitting in the ICE van at Newark Airport. At 12:35 p.m., Omorodion's counsel sent an email to the Washington Field Office reiterating the request for a legal call, but she never received a response to that message.

**II. Proposed Removal to Rwanda**

At the hearing on the Petition, Vu Cam, the Acting Unit Chief of the ICE Removal Management Division, testified that as of May 18, 2026, the State Department had an arrangement with the Government of Rwanda under which Rwanda had agreed to accept a third-country removal of Omorodion to that nation. Cam asserted that the United States had received diplomatic assurances from Rwanda that individuals removed to that country will not be tortured. He further stated that the United States has already sent two flights to Rwanda with individuals subject to third-country removals, and that Omorodion had been scheduled to be removed on August 24, 2026, but the removal was not effectuated due to a stay order entered by this Court.

In support of this testimony, Respondents have provided a May 18, 2026 letter from the Deputy Secretary of State to the Acting Director of ICE, which generally states that the Government of Rwanda has provided diplomatic assurances that noncitizens removed there would "not be persecuted or tortured," and that Rwanda "intends to act in accordance with its national and international obligations . . . including the 1984 Convention Against Torture" and "prevention of refoulement and access to asylum and protection systems." State Dep't Letter at 1, Hrg. Ex. 3,

ECF No. 25-2. The letter further stated that it was "the Department of State's view that the assurances received from the Government of Rwanda are credible and reliable." *Id.*

Respondents have also submitted emails dated June 1, 2026 between the State Department and ICE, including an email from the State Department stating that Rwanda was prepared to accept a list of 15 third-country nationals for removal to Rwanda, which included Omorodion. At the same time, the emails stated that the removal of those individuals was "not actionable at this time," and that the State Department was "not ready to send a flight to Rwanda yet given the public health situation in neighboring countries." 6/1/26 Emails at 1, Hrg. Ex. 2, ECF No. 25-1.

**DISCUSSION**

Pursuant to 28 U.S.C. § 2241, a United States district court may grant a petition for a writ of habeas corpus if a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). In the Petition, Omorodion argues that: (1) in re-detaining him, ICE failed to follow its own regulations, specifically 8 C.F.R. §§ 241.4 and 241.13, including in that it did not provide sufficient notice of the reasons for his detention or an opportunity to respond to those reasons, such that his re-detention was unlawful under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) ("*Accardi*") and under the Due Process Clause of the Fifth Amendment to the Constitution; (2) his detention violates the INA on the grounds that it is not reasonably foreseeable that he will be removed to Rwanda or any other country, in violation of 8 U.S.C. § 1231(a)(6) as interpreted by *Zadvydas v. Davis*, 533 U.S. 678 (2001); (3) any action by Respondents to remove Omorodion to a third country without providing him with an adequate screening for a reasonable fear of persecution or torture in that country, as well as a review by an immigration judge of any negative determination based on such an interview, would violate his due process rights; and (4) removal to a third country where he would

be imprisoned or tortured would be punitive, in violation of the Fifth and Eighth Amendments to the Constitution. As relief, he seeks (1) release from ICE detention; and (2) an order directing that Respondents not detain him again unless they are prepared to comply with 8 C.F.R. §§ 241.4 and 241.13 and provide him with due process prior to any removal to a third country.

## I. Jurisdiction

As a threshold issue, Respondents contend that the Court lacks jurisdiction over the Petition because, at the time it was filed, Omorodion was not detained in Maryland, as ICE had already transported him out of Maryland to New Jersey. In general, jurisdiction over a petition for a writ of habeas corpus exists only in the judicial district in which the petitioner is confined at the time of filing. *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004); *Suri v. Trump*, 184 F.4th 260, 276 (4th Cir. 2026). In *Padilla*, however, the United Supreme Court recognized that when "a prisoner is held in an undisclosed location by an unknown custodian," this district-of-confinement rule becomes "impossible to apply." *Padilla*, 542 U.S. at 450 n.18. Thus, the United States Court of Appeals for the Fourth Circuit has adopted an "unknown custodian exception" to the district-of-confinement rule by holding that when a petitioner's district of confinement and immediate custodian are unknown, "jurisdiction is therefore proper in [the petitioner's] last-known location." *Suri*, 184 F.4th at 278.

In *Suri*, the petitioner was arrested by ICE in Virginia and, within the first 18 hours after his arrest, was moved between multiple detention facilities in that state before he was sent to a detention center in Alexandria, Louisiana. *Id.* at 271. Notably, the petitioner was not told that he was being sent to Louisiana and was not allowed to contact his family or attorney to tell them that he was being moved there, and his attorney made multiple attempts to find him through the online ICE detainee locator system, but his name did not appear in that system. *Id.* at 271–72. As a

result, his attorney filed a federal habeas petition in the United States District Court for the Eastern District of Virginia after the plane in which he was transported had already landed in Louisiana. *Id.* at 272. The court found that, where the petitioner had not been allowed to contact anyone about his transfer, and ICE's online detainee tracker did not provide any location information for the petitioner until the day after the petition was filed, such that "it is not clear how any other diligent attorney could have known" that the petitioner was in Louisiana at the time of filing, the "unknown custodian exception" applied, and jurisdiction was proper in the Eastern District of Virginia. *Id.* at 277–78.

Here, after his arrest, Omorodion, as in *Suri*, was quickly transported across state lines, from Baltimore, Maryland to Newark, New Jersey, then flown to Alexandria, Louisiana, all without being told where he was being brought and without being allowed to contact his family or attorneys. As in *Suri*, Omorodion's attorneys made repeated, unsuccessful attempts to ascertain his whereabouts before filing the Petition, including five phone calls or emails to the ICE Washington Field Office, which oversees ICE operations in Maryland, between Omorodion's arrest and the filing of his habeas petition only six hours later. Although Respondents have argued that Omorodion's counsel should have checked the ICE detainee locator, at the hearing on the Petition, Respondents' counsel did not dispute that the detainee locator would not have identified the specific location of a detainee in transit, such as one who was being driven to or was at Newark Airport, and acknowledged that it is updated only every two to three days. The record therefore demonstrates that at the time that the Petition was filed, Omorodion's location and immediate custodian were unknown, and "it is not clear how [a] diligent attorney could have known" that he had been transported to New Jersey. *Suri*, 184 F.4th at 277. As a result, the Court finds that the

unknown custodian exception applies, so jurisdiction is proper in Omorodion's last known location, the District of Maryland.

Respondents' citation to cases in which judges of this District dismissed or transferred a petition not filed in the district of confinement does not alter this conclusion. All of these cases predate *Suri* and thus did not have the benefit of the Fourth Circuit's adoption of the unknown custodian rule, and none included, as is present here, a factual record demonstrating actions by ICE that prevented the petitioner from communicating his location and diligent efforts by counsel to ascertain the petitioner's location prior to filing. *See Hernandez Escalante v. Noem*, No. 25-cv-01799-PX, Order at 2 (D. Md. June 25, 2025) (ECF No. 18); *Urrea-Calderon v. Noem*, No. 25-cv-03549-DLB, Order at 4–5 (D. Md. Nov. 3, 2025) (ECF No. 11); *Mbabid v. Baker*, No. 25-cv-3505-MJM, 2025 WL 3211024, at *2–3 (D. Md. Nov. 18, 2025).

Finally, although Respondents seek a transfer to the District of New Jersey; the Eastern District of Louisiana, where Omorodion was detained following his flight from Newark Airport; or the Eastern District of Virginia, where he is presently detained, they make no argument for such a transfer other than their unsuccessful claim that the Court lacks jurisdiction in the District of Maryland. In any event, it is not clear that a transfer to the Eastern District of Louisiana or the Eastern District of Virginia would be permissible, as Omorodion was not detained in those District until after the filing of the Petition. *See Suri*, 184 F.4th at 281 (noting that "there is no reason to think . . . that a habeas petition challenging present confinement could be filed in a district to which a petitioner had not yet been"). As for the District of New Jersey, where the only connection of this case to New Jersey is that Omorodion spent a few hours in that state prior to taking a flight from Newark Airport to Louisiana, and Omorodion "resides, was arrested, and was originally detained" in the District of Maryland and has "strong connections" to this District, the Court finds

that a transfer to the District of New Jersey would prejudice Omorodion while retaining the case in the District of Maryland would not prejudice Respondents. *See Suri*, 184 F.4th at 281–82 (finding that such considerations weighed in favor of declining to transfer a habeas petition out of the petitioner's home district).

The Court therefore finds that it has jurisdiction over the Petition and will not transfer this case to another district.

## II. *D.V.D. v. U.S. Department of Homeland Security*

In their Answer, as a threshold issue, Respondents argue that this case should be dismissed or stayed in light of *D.V.D. v. U.S. Department of Homeland Security*, 778 F. Supp. 3d 355 (D. Mass. 2025), a case in which the court granted a preliminary injunction relating to a certified class of individuals who are presently subject to a final order of removal and whom ICE "has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed." *Id.* at 378, 392–93. The preliminary injunction, which directed that certain procedural steps occur before any removal of a class member to a third country, *id.* at 392–93, was stayed by the Supreme Court. *See Dep't of Homeland Security v. D.V.D.*, 145 S. Ct. 2153, 2153 (2025). Since then, the district court has granted judgment in favor of the plaintiffs and issued a declaratory judgment that the class members have a right to "meaningful notice" and "a meaningful opportunity to raise a country-specific claim against removal before removal to any third country" under both the INA, 8 U.S.C. § 1231(b), and the Due Process Clause of the Fifth Amendment. *D.V.D. v. U.S. Dep't of Homeland Security*, 821 F. Supp. 3d 102, 147, 163, 167 (D. Mass. 2026). The court also declared unlawful and set aside the Government's existing third-country removal policy, which was set forth in a

March 30, 2025 United States Department of Homeland Security ("DHS") memorandum entitled "Guidance Regarding Third Country Removal" ("the DHS Guidance"). *Id.* at 167–68. After granting a stay pending appeal, on September 18, 2026, the United States Court of Appeals for the First Circuit affirmed those rulings on the grounds that notice and an opportunity to assert a fear-of-persecution claim against third-country removal are required by the INA and applicable regulations. *D.V.D. v. Dep't of Homeland Security*, ___ F.4th ___, No. 26-1212, 2026 WL 2797801, at *15–17, *20 (1st Cir. Sept. 18, 2026). On September 24, 2026, the Government filed an Application for a Stay of the First Circuit's ruling in *D.V.D.* with the Supreme Court, so that judgment likely cannot be deemed final for an unspecified period of time. Application for Stay at 1, *Dep't of Homeland Sec. v. D.V.D.*, No. 26A404 (U.S. Sept. 24, 2026).

Although the parties agree that Omorodion falls within the definition of the certified class, the Court finds that his membership in the class does not preclude consideration of the Petition. Where Omorodion primarily seeks relief from detention pending any removal, he seeks relief that is not sought on behalf of the class in *D.V.D.* *See Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 383 (D. Md. 2025) ("Because [the petitioner] challenges his continued *detention*, which is not addressed in *D.V.D.*, a stay or dismissal of the entire case based on *D.V.D.* would be inappropriate."); *Mendoza Palacios v. Mullin*, 829 F. Supp. 3d 67, 78 (D. Md. 2026) ("*D.V.D.* does not address a challenge to continued detention during third-country review and therefore does not affect [the petitioner's] challenge of her continued detention pending any procedure for third-country removal.").

To the extent that Omorodion also seeks an order directing Respondents to provide him with notice and a meaningful opportunity to contest removal to a third country on the basis of a fear or likelihood of persecution in such a third country, he seeks relief similar to that sought in

*D.V.D.* *See D.V.D.*, 821 F. Supp. 3d at 167–68. As discussed below, however, the Court will primarily focus on the legality of Petitioner's continued detention prior to removal, rather than the removal itself. To the extent that the Court's rulings impact the issue of whether the contemplated third-country removal is lawful, the Court finds that it may address Omorodion's claims based on the reasoning in *Portela-Hernandez v. Trump*, No. 25-1633-BAH, 2026 WL 74042, at *8 (D. Md. Jan. 9, 2026), in which the court considered the petitioner's claims in part because abstaining from doing so in favor of the *D.V.D.* litigation would "effectively preclude . . . the relief" sought and would "potentially foreclose any relief that he could be entitled to as part of the *D.V.D.*" *Id.* at *10. Here, the Court similarly finds that, in light of the specific facts at issue, under which a final ruling in the *D.V.D.* litigation cannot be reached until the completion of proceedings before the Supreme Court of indefinite duration, and Respondents have asserted that they will remove Omorodion to Rwanda in short order absent a ruling from this Court barring such a removal, a dismissal or stay of this case would effectively foreclose the relief sought by Omorodion because he would almost certainly be removed before the final resolution of *D.V.D.* Multiple courts have applied the same or similar reasoning in concluding that they can and should hear the claims of a petitioner who is a member of the *D.V.D.* class. *See, e.g.*, *Sagastizado v. Noem*, 802 F. Supp. 3d 992, 1008 (S.D. Tex. 2025) (declining to dismiss claims on the grounds that the petitioner was a member of the *D.V.D.* class because to do so "would effectively preclude [the petitioner] from the relief he seeks entirely and potentially foreclose any relief that he could be entitled to as part of the *D.V.D.* class if he is removed before the class-wide claims are resolved"); *Santos Escobar v. Mullin*, Civ. No. GLR-26-1740, 2026 WL 1674825, at *5 (D. Md. June 10, 2026); *Takletsadik v. Guadian*, Civ. No. MJM-26-3148, 2026 WL 2614243, at *2 (D. Md. Sept. 3, 2026). Accordingly, the Court will not dismiss or stay the Petition pending the resolution of *D.V.D.*

## III. Violation of Regulations

Among other arguments, Omorodion contends that his detention is unlawful because he was detained without notice of the reason for his detention or a meaningful opportunity to respond, such that ICE failed to follow its own regulations requiring such procedural protections. Specifically, Omorodion argues that Respondents failed to comply with the procedural requirements set forth in 8 C.F.R. §§ 241.4 and 241.13, which govern the processes ICE must follow when revoking a noncitizen's release on conditions.

The Supreme Court recognized in *United States ex rel. Accardi v. Shaughnessy* ("*Accardi*"), 347 U.S. 260 (1954), that a federal agency's failure to comply with its own regulations may render the associated agency action unlawful. *Id.* at 268. Since then, courts have recognized that under the *Accardi* doctrine, based on principles of procedural due process, "an agency's failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination" upon a showing of prejudice. *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999). Prejudice can be presumed when the regulations at issue consist of "an entire procedural framework, designed to insure the fair processing of an action affecting an individual." *Delgado-Corea v. Immigr. & Naturalization Serv.*, 804 F.2d 261, 263 (4th Cir. 1986) (approving of this analysis); *Morgan*, 193 F.3d at 267 (same).

Two separate regulations govern the procedures that ICE must follow when it revokes a noncitizen's release and re-detains the person. The first is 8 C.F.R. § 241.4(*l*), which generally governs revocation of release and, as relevant here, provides that ICE may revoke a noncitizen's release when a designated revoking official determines that "it is appropriate to enforce a removal order." 8 C.F.R. § 241.4(*l*)(2)(iii). The second is 8 C.F.R. § 241.13(i), which governs revocation

of release in cases where the noncitizen was initially released from ICE detention pursuant to a determination by ICE that removal was not reasonably foreseeable and allows ICE to revoke the release "on account of changed circumstances" that create a "significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). Although the parties disagree on which regulation governs, where the Notice of Revocation specifically states that the revocation was pursuant to 8 C.F.R. § 241.4(*l*), the Court finds that ICE was required to comply with the provisions within that regulation. Nevertheless, as discussed below, 8 C.F.R. § 241.13(i), which appears to be directly relevant to the present circumstances where Omorodion was re-detained only one week after he was ordered released by a federal court that found that his removal was not reasonably foreseeable, has substantially similar requirements, such that the result of the analysis is the same regardless of whether 8 C.F.R § 241.4(*l*) or 8 C.F.R. § 241.13(*i*) is applicable.

Although Omorodion argues that Respondents violated multiple requirements within 8 C.F.R. § 241.4(*l*), the Court will focus on two. 8 C.F.R. § 241.4(*l*) requires that when a noncitizen is re-detained, (1) ICE must notify the individual of the reason that release is being revoked; and (2) ICE must provide the noncitizen with an opportunity to respond to those reasons through an informal interview. 8 C.F.R. § 241.4(*l*)(1) (requiring that upon revocation, the noncitizen "will be notified of the reasons for revocation of his or her release" and "will be afforded an initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification"); *see also* 8 C.F.R. § 241.13(i)(3) (requiring that upon revocation, a noncitizen "will be notified of the reasons for revocation of his or her release" and that ICE "will conduct an initial informal interview promptly after his or her return to [ICE] custody" to afford "an opportunity to respond to the reasons for revocation stated

in the notification"); *Vo v. Lyons*, No. 25-CV-533-JL-TSM, 2026 WL 323133, at *4 (D.N.H. Jan. 27, 2026) ("[B]oth §§ 241.4 and 241.13 require, at minimum, that ICE articulate a meaningful, individualized basis for revocation sufficient to give the noncitizen notice of the grounds for re-detention and an opportunity to respond.").

Here, the record shows that ICE failed to meet these requirements. As to the requirement of notice of the reasons for revocation, ICE must provide "a meaningful, individualized basis for revocation sufficient to give the noncitizen notice of the grounds for re-detention and an opportunity to respond." *Mejia v. U.S. Immigr. & Customs Enf't & Removal Operations*, 828 F. Supp. 3d 273, 280 (D.N.H. 2026). The notice "must provide real, specific, concrete information that a noncitizen could actually respond to." *Hashemi v. Noem*, 809 F. Supp. 3d 1027, 1035 (C.D. Cal. 2025). Respondents point only to the Notice itself which, based on the checked boxes, informed Omorodion only that ICE had determined that it was "appropriate to enforce a removal order against you as ICE has the ability and means to effectuate your removal," and that "your case is under review for removal to an alternate country." Notice at 1. Such vague statements did not include any facts providing any reason why ICE suddenly had the ability to remove Omorodion, particularly when a federal court had released him only one week earlier after finding that asserted efforts to remove him to a third country did not demonstrate that removal was reasonably foreseeable. Most importantly, neither the Notice of Revocation nor the ICE officers who presented it to Omorodion informed him that ICE had a plan to remove him to Rwanda, a fact that Omorodion needed to know in order to respond properly to the "reasons for revocation of his . . . release." 8 C.F.R. § 241.4(*l*)(1).

Numerous federal courts have found that such generic statements lacking any facts that reveal a specific reason for the revocation are insufficient to meet the requirement of notice of the

reasons for revocation under either 8 C.F.R. § 241.4(*l*) or 8 C.F.R. § 241.13(i). *See, e.g.*, *Sokpa-Anku v. Mullin*, No. 26-CV-01504 (AJT/LRV), 2026 WL 1878709, at *4 (E.D. Va. June 29, 2026) (finding that a Notice of Revocation stating that there were "changed circumstances" such that "the petitioner can be expeditiously removed" did not amount to valid notice as it "simply recite[d] the language of the regulation" (quoting *Aguilar v. Mullin*, No. 26-CV-00588 (AJT/WBP), 2026 WL 1256825, at *4 (E.D. Va. Apr. 29, 2026))); *Vo*, 2026 WL 323133, at *5 (finding that a Notice of Revocation that merely "quote[d] language from two different regulations in a manner that offer[ed] no meaningful explanation as to the basis for [the] revocation" was invalid under both 8 C.F.R. §§ 241.4(*l*) and 241.13.(i)); *Mejia*, 828 F. Supp. 3d at 280 (stating that "[g]eneric and conclusory statements offered in a Notice of Revocation are insufficient bases for revoking . . . supervised release under either" 8 C.F.R. §§ 241.4(*l*) or 241.13(i) (quoting *Hall v. Nessinger*, No. 25-CV-667-JJM-PAS, 2026 WL 18583, at *7 (D.R.I. Jan. 2, 2026))). Indeed, another judge in this District has found that a notice was insufficient in stating the reasons for revocation in part because it did not identify the specific third country to which removal was designated to occur. *See Marroquin Escobar v. Noem*, No. 26-CV-00590-PX, 2026 WL 1109342, at *4 (D. Md. Apr. 24, 2026). Likewise, the Court finds that where ICE did not inform Omorodion that the reason for the revocation was the purported plan to remove him to Rwanda, ICE failed to comply with the regulatory requirement of providing notice of the reasons for the revocation.

As for the requirement that ICE provide an opportunity to respond to the reasons for revocation, Respondents have provided a record that appears to show that ICE officers attempted to conduct an informal interview with Omorodion for this purpose, but it did not occur because Omorodion declined to make any statements without having his attorney present. Although such an invocation of the right to counsel may explain the lack of a robust informal interview, the Court

does not find that it demonstrates that ICE complied with the requirement of an informal interview providing an opportunity to respond to the reasons for revocation. 8 C.F.R § 241.4(*l*), as well as 8 C.F.R. § 241.13(i), explicitly provide that the purpose of the informal interview is to allow the detainee an opportunity to respond to and refute the reasons behind their revocation of release. Where Omorodion was never given adequate notice of the reasons for the revocation, the offer of an informal interview cannot be deemed to constitute an opportunity to respond to those reasons and thus to satisfy the regulatory requirement of such an opportunity. *See Hashemi*, 809 F. Supp. 3d. at 1035 (finding that no valid informal interview occurred where the detainee "was not given the reasons for revocation" and therefore "could not have meaningfully responded to them at this alleged informal interview"); *Mejia*, 828 F. Supp. 3d at 281 ("The basis for revoking a noncitizen's release must be communicated to the noncitizen at a time and in a manner that permits him to marshal evidence demonstrating that his liberty ought not be restrained.").

This Court has previously determined that 8 C.F.R. §§ 241.4(*l*) and 241.13(i) were promulgated with the purpose of protecting ICE detainees' due process rights. *Santamaria Orellana v. Baker*, No. 25-1788-TDC, 2025 WL 2444087, at *6 (D. Md. Aug. 25, 2025). The Court incorporates that analysis here. Thus, where Respondents violated their own regulations in revoking Omorodion's release without providing proper notice of the reasons for revocation and an opportunity to respond to those reasons through an informal interview, *see* 8 C.F.R. §§ 241.4(*l*)(1), 241.13(i)(2), and such regulations were put in place to provide due process, the Court concludes that the re-detention of Omorodion was unlawful under the *Accardi* doctrine and thus must be set aside. *See Morgan*, 193 F.3d at 266–67.

**IV. Due Process**

Omorodion argues that he should be released from detention because his removal is not reasonably foreseeable, which makes his continued detention under 8 U.S.C. § 1231(a) unlawful. As an initial matter, the parties agree that Omorodion is detained pursuant to 8 U.S.C. § 1231(a). That provision establishes that, upon the issuance of a final order of removal to a noncitizen, the individual shall be removed "within a period of 90 days," a time period referred to in the statute as the "removal period," and shall be detained during the removal period. *See* 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')."); 8 U.S.C. § 1231(a)(2)(A) ("During the removal period, the Attorney General shall detain the alien."); *Mestanek v. Jaddou*, 93 F.4th 164, 170–71 (4th Cir. 2024); (noting that the Homeland Security Act of 2002 largely transferred the Attorney General's authorities relating to federal immigration laws to the Secretary of Homeland Security). Next, § 1231(a) requires that noncitizens who do not leave the United States or are not removed within the removal period, "pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3). Certain noncitizens, however, including those who are removable based on certain criminal convictions, may be detained beyond the removal period. *See* 8 U.S.C. § 1231(a)(6) ("An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period . . . ."). If released, a noncitizen belonging to a category described in 8 U.S.C. § 1231(a)(6) also "shall be subject to the terms of supervision" in [8 U.S.C. § 1231(a)(3)]." 8 U.S.C. § 1231(a)(6).

Respondents assert, and Omorodion does not dispute, that Omorodion may be detained following the removal period pursuant to 8 U.S.C. § 1231(a)(6).

In *Zadvydas*, the Supreme Court considered whether 8 U.S.C. § 1231(a)(6) authorizes detention of a noncitizen subject to a removal order "indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal." *Zadvydas*, 533 U.S. at 682. In that case, the petitioners had received removal orders but were detained past their respective removal periods in part because their native countries and other countries with which they had some familial ties had refused to accept them. *See id.* at 684–86. Recognizing the "serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty," *id.* at 692, the Supreme Court held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. The Court thus directed federal habeas courts to determine "whether the detention in question exceeds a period reasonably necessary to secure removal" and to "measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal." *Id.* If removal is not "reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699–700.

The Court acknowledged, however, that "review must take appropriate account of the greater immigration-related expertise of the Executive Branch" and that doing so "will often call for difficult judgments." *Id.* at 700. To limit "the occasions when courts will need to make" such judgments, the Court recognized a "presumptively reasonable period of detention." *Id.* After noting that Congress likely did not conclude that the 90-day removal period it established in 8 U.S.C. § 1231(a)(1) was sufficient to accomplish "all reasonably foreseeable removals," the Court

established that the "presumptively reasonable period of detention" is six months, and stated that, after that period, once a noncitizen "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701.

Here, Omorodion has been detained well beyond the presumptively reasonable period contemplated in *Zadvydas*. Omorodion's removal order was entered on April 24, 2024 and became final, at the latest, on October 25, 2024 when the BIA affirmed the immigration court's grant of withholding of removal. Since that latter date, Omorodion has spent approximately 18 months in ICE detention. More importantly, another federal court has found, as recently as August 11, 2026 and thus only one week before he was re-detained, that Omorodion's removal was not reasonably foreseeable and therefore released him. *Omorodion I*, 2026 WL 2323240, at *5 (finding that the record demonstrated that "removal is no more likely today than it was the day his removal order was entered"). Omorodion thus has provided "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Accordingly, Respondents have the burden to provide evidence to rebut that showing and demonstrate that, during the week following Omorodion's release by the Middle District of Louisiana, his removal suddenly became reasonably foreseeable. *See id.*

### A. Evidence of Foreseeable Removal

Respondents have asserted that Omorodion's removal is now reasonably foreseeable because they have a specific plan to remove him to Rwanda. Although Respondents' initial submission was limited to a vague declaration by Acting Unit Chief Cam that lacked specificity, Respondents have since provided testimony and documentation that appears to show that Rwanda has agreed to accept Omorodion pursuant to a third-country removal. In addition to a May 18,

2026 letter from the State Department stating that Rwanda had generally agreed to accept third-country removals and had provided certain diplomatic assurances, Respondents have also submitted an email sent from the State Department to ICE on June 1, 2026 stating that Omorodion was on a list of individuals that Rwanda had agreed to accept as third-country removals. The email, however, also stated that the State Department was "not ready to send a flight to Rwanda yet given the public health situation in neighboring countries," and a follow-up email by an ICE official stated that the removal list was "not actionable at this time." 6/1/26 Emails at 1. Although Cam has generally testified that Omorodion can now be removed, he did not appear to have firsthand information for any of his testimony, and he did not address whether and when the barrier to removal identified in the June 2026 emails was resolved. Notably, despite the June 2026 emails, there is nothing in the record demonstrating that Respondents argued in relation to the habeas petition in the Middle District of Louisiana that removal to Rwanda had been approved and was reasonably foreseeable. Rather, the information provided to that court related only to efforts to seek removal to different countries, including Cananda, Ghana, Niger, Cameroon, France, Spain, England, and Germany, which the court found were not sufficiently advanced to render Omorodion's removal reasonably foreseeable. *Omorodion I*, 2026 WL 2323240, at *2, *4 n.8, *5. Respondents have provided no information about developments that occurred between the time of Omorodion's release by that court on August 11, 2026 and his re-detention one week later that increased the likelihood of removal. Thus, there remain unanswered questions about whether the plan to remove Omorodion to Rwanda ever became operational. Ultimately, as discussed below, this Court need not decide whether, as a factual matter, Respondents have provided sufficient evidence of an imminent removal to Rwanda to meet their burden to show that Omorodion's removal is now likely to occur in the reasonably foreseeable future, because the Court finds that

removal is not reasonably foreseeable based on Omorodion's due process argument. *See infra* part IV.B.

**B. Third-Country Removal Procedures**

Respondents have acknowledged that, in relation to Omorodion, they are proceeding under the March 30, 2025 DHS Guidance relating to the potential removal to third countries of noncitizens who are subject to final orders of removal but who cannot be removed to their home countries. Under the DHS Guidance, if DHS has received "diplomatic assurances" from a third country that noncitizens removed to that country will not be persecuted or tortured, and the State Department finds those assurances to be credible, a noncitizen with a final order of removal will be removed without the need for further procedures. Ans. at 7–8, ECF No. 14. Thus, where Respondents have asserted that Rwanda has provided such credible diplomatic assurances, they plan to remove Omorodion on the next available flight for third-country removals to Rwanda, without any additional process. Omorodion argues that due process requires notice of the third country to which removal is designated to occur and an opportunity to be heard on any fear-based claims, including through a reasonable fear interview by an asylum officer as well as review of any negative fear determination by an immigration judge.

It is "well established" that the Fifth Amendment entitles noncitizens to due process of law in the context of removal proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *United States v. Lopez-Collazo*, 824 F.3d 453, 460–61 (4th Cir. 2016). Here, the relevant question is whether due process requires more than diplomatic assurances that a noncitizen will not be subjected to persecution or torture and a general credibility assessment of those assurances before Omorodion can be removed to Rwanda. To determine what process is required, the Court considers the three-factor test outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976): (1) "the private interest that will

be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

Applying this analysis, numerous courts have concluded that prior to the removal to a third country of noncitizens with final orders of removal to their home countries and withholding of removal or some other bar on removal to those countries, due process requires the provision of a reasonable fear interview by a DHS asylum officer and the opportunity to have a negative fear determination reviewed by an immigration judge. *See, e.g.*, *Portela-Hernandez*, 2026 WL 74042, at *11–12; *Takletsadik*, 2026 WL 2614243, at *4; *Cruz Medina v. Noem*, 806 F. Supp. 3d 536, 549 (D. Md. 2025) (applying the *Mathews* test and finding a likelihood of success on the merits of the due process claim). Upon consideration of such case law, the Court applies the *Mathews* test and reaches the same conclusion.

First, the private interest affected by official action is Omorodion's interest in not being removed to a country where he could face persecution or torture. Through his attorney, Omorodion has expressly requested a reasonable fear interview to address his fear of removal to Rwanda, which is based in part on the risk of transfer to Nigeria, the country to which he has withholding of removal. This interest is "precisely the type of interest that courts consistently have held is significant enough to justify procedural protections to ensure that individuals who are actually entitled to withholding of removal under [8 U.S.C.] § 1231(b)(3) or the Convention Against Torture receive such protection." *Cruz Medina*, 806 F. Supp. 3d at 549; *see Takletsadik*, 2026 WL 2614243, at *3; *cf. Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (noting that noncitizens are

entitled to due process in the context of removal proceedings). Indeed, the fact that Congress has provided protections for such an interest in the form of withholding of removal, 8 U.S.C. § 1231(b)(3), and the adoption of the Convention Against Torture demonstrates that Omorodion's private interest is one that is properly the subject of due process protections. *See Cruz Medina*, 805 F. Supp. 3d at 549.

Second, the risk of an erroneous deprivation is high under the procedures described in the DHS Guidance. Where noncitizens subjected to a third-country removal, such as Omorodion, typically already have a fear of persecution or torture in their home country such that removal there was previously barred, a third-country removal presents a significant risk of erroneous deprivation, at a minimum based on the potential for the noncitizens to be transferred back to their home countries. The procedural protections under the DHS Guidance, however, are limited to "diplomatic assurances" from Rwanda that it "intends to act in accordance with its national and international obligations . . . including the 1984 Convention Against Torture" and "prevention of refoulement and access to asylum and protection systems." State Dep't Letter at 1. Although these assurances reference the issue of potential transfer to another country, Respondents have provided no facts demonstrating how Rwanda could ensure the safety of Omorodion or others subjected to similar third-country removals once they are outside of its jurisdiction. The risk is further heightened in light of factual findings by the Supreme Court of the United Kingdom in 2023, to which Omorodion has directed this Court, which concluded that upon consideration of the asylum system in Rwanda, there were "substantial grounds" for believing that individuals left to pursue claims for asylum in Rwanda would "be at risk of being returned directly or indirectly to their country of origin." *R v. Sec'y of State for the Home Dep't*, [2023] UKSC 42, [105] (U.K.).

Courts have found that in the face of this risk, a reasonable fear interview by an asylum officer is insufficient to provide procedural protections absent the availability of a review of a negative fear determination by an immigration judge. *See Cruz Medina*, 806 F. Supp. 3d at 549 (finding that where an individual "alleges that he would be persecuted or tortured if removed to a particular country, a single review by an asylum officer creates an unacceptably high risk of erroneous deprivation"); *Portela-Hernandez*, 2026 WL 74042, at *3, *11. Indeed, INA regulations provide for both a reasonable fear interview and immigration judge review in relation to a potential claim of fear of persecution or torture in a noncitizen's home country. *See e.g.* 8 C.F.R. §§ 208.31(g), 1208.31(g). Here, in light of the diplomatic assurances, Respondents assert that the DHS Guidance does not even require a reasonable fear interview by a DHS asylum officer. In Omorodion's case, he has received no such interview, and although an informal interview upon revocation of release is not intended to constitute a reasonable fear interview, as discussed above, Omorodion was not informed that his release was revoked in order to remove him to Rwanda, so he did not even have that limited opportunity to raise specific concerns about such a removal. Under these circumstances, the Court finds that the risk of erroneous deprivation is high.

Third, the Court must assess the balance between mitigating the erroneous deprivation of Omorodion's private interest and the Government's fiscal and administrative burden of providing additional procedural protections. *See Mathews* 424 U.S. at 347. Here, the risk of erroneous deprivation of protection from persecution or torture can be reduced through the application of the longstanding procedures requiring a reasonable fear interview and review by an immigration judge prior to removing individuals to their home countries. *See Cruz Medina*, 806 F. Supp. 3d at 550. As another judge in this District has noted, these additional procedures "would likely result in some delay and administrative burden, '[b]ut some delay and administrative burden is inherent in

due process.'" *Barrientos v. Baker*, No. MJM-26-0984, 2026 WL 1166361, at *4 (D. Md. Apr. 8, 2026) (quoting *Cruz Medina*, 806 F. Supp. 3d at 551). Where the proposed procedures are already established and used for the analogous purpose referenced above, *see, e.g.*, 8 C.F.R. §§ 208.31(g), 1208.31(g), and thus do not require Respondents to venture into uncharted procedural waters, the Court finds that the burden on Respondents is limited and is outweighed by the likely significant reduction in the risk of deprivation of rights to noncitizens such as Omorodion.

The Court therefore agrees with the substantial number of district courts that the summary third-country removal of a noncitizen such as Omorodion with no procedural protections other than the described diplomatic assurances, and without a reasonable fear interview and the availability of review by an immigration judge of a negative fear determination, violates due process.

### C. Reasonable Foreseeability

Having determined that due process requires that Omorodion receive a reasonable fear interview and, if necessary, review of a negative fear determination by an immigration judge prior to any third-country removal, the Court must consider whether his removal is, in fact, reasonably foreseeable under *Zadvydas*.

Several courts have concluded that because of the need for such procedures to be conducted prior to a third-country removal, the removal of the petitioner is not reasonably foreseeable. In *Portela-Hernandez*, the court held that even after the petitioner received a reasonable fear interview, a lawful removal was not reasonably foreseeable because the Government maintained the position that no additional process was due, such that the required immigration judge review was not expected to occur, and there was no identifiable end to the petitioner's detention. *Id.* at *14. In *Takletsadik*, the court reached the same conclusion under similar facts, because the

petitioner faced "indefinite and potentially permanent detention" awaiting such review. *Takletsadik*, 2026 WL 2614243, at *4.

Here, Omorodion is in the same position as the petitioners in those cases except that he is further away from a lawful removal, because Respondents' position is that he is entitled to neither a reasonable fear interview nor immigration judge review. Further, in light of the related but separate *D.V.D.* litigation, in which the Government has maintained that additional procedural protections are not required for third-country removals and is seeking Supreme Court review, it stands to reason that Respondents cannot reasonably be expected to change their position and start providing the additional due process protections that this Court deems to be required until after the completion of that litigation, which will likely continue for a substantial additional period of time. Under these circumstances, the Court finds that Omorodion cannot be lawfully removed in the reasonably foreseeable future such that his detention violates 8 U.S.C. § 1231(a)(6). *See Zadvydas*, 533 U.S. at 701; *Portela-Hernandez*, 2026 WL 74042, at *13–14; *Taletsadik*, 2026 WL 2614243, at *4.

For this reason, and because the re-detention of Omorodion violated Respondents' own regulations, *see supra* part III, the Court will grant the Petition, order Omorodion's release, and order that Respondents may not re-detain him unless (1) they comply with the requirements of 8 C.F.R. § 241.13(i); and (2) he has already received a reasonable fear interview and, if he seeks it, review of the fear determination by an immigration judge. Accordingly, the Court need not address the parties' remaining arguments.

## V. Attorney General

Finally, Respondents contend that Attorney General Todd Blanche is not a proper respondent because he does not have custody over Omorodion or the ability to produce him before

the Court. In *Padilla*, the Supreme Court held that "the proper respondent to a habeas petition is the person who has custody over [the petitioner]." *Padilla*, 542 U.S. at 434–35. However, as other judges in this District have noted, *Padilla* explicitly left open the question of "whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation." *Id.* at 435 n.8. Courts have been divided on whether *Padilla*'s immediate custodian rule applies to immigration habeas petitions at all. *See Jarpa v. Mumford*, 211 F. Supp. 3d 706, 723–24 (D. Md. 2016) (collecting cases). Some courts have held that the immediate custodian rule articulated in *Padilla* does not apply in such cases because the petitioner would be permitted to sue only the warden of the detention facility, who lacks the legal authority to grant relief. *See Solis Nolasco v. Noem*, 820 F. Supp. 3d 398, 408 (D. Md. 2026) (quoting *Jarpa*, 211 F. Supp. 3d at 724).

Notably, while Omorodion may be in the custody of ICE, the Attorney General has a role in relation to the present circumstances because the United States Department of Justice includes the Executive Office of Immigration Review, which in turn includes the immigration courts and the BIA. 8 C.F.R. §§ 1003.0(a), (b). Where the law on this issue is unsettled, and the Court has found that Omorodion cannot be re-detained for removal to a third country unless he is first provided with a reasonable fear interview and, if he seeks it, review of the fear determination by an immigration judge, the Court cannot presently conclude that the Attorney General is not a proper respondent. The Court will therefore decline to dismiss the Attorney General from this case.

**CONCLUSION**

For the foregoing reasons, the Petition for a Writ of Habeas Corpus will be GRANTED, subject to the terms of the separate Order to be issued.

Date: September 29, 2026

THEODORE D. CHUANG
United States District Judge